J-A04044-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: J.B., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| APPEAL OF: J.F., NATURAL FATHER | |
| | No. 1230 WDA 2015 |

Appeal from the Order July 17, 2015
In the Court of Common Pleas of Lawrence County
Orphans' Court at No(s): 20068 OF 2013, OC-A

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., and SHOGAN, J.

MEMORANDUM BY SHOGAN, J.:                    **FILED APRIL 19, 2016**

Appellant, J.F. ("Father"), is the natural father of J.B. who was born in 2008.  Father appeals from the order entered on July 17, 2015, granting a petition for the involuntary termination of his parental rights that was filed by J.B.'s natural mother ("Mother").  After careful review, we affirm.

The relevant facts and procedural history of this matter were set forth by the orphans' court as follows:

> Before the Court for disposition is a Petition for Involuntary Termination of Parental Rights, (hereinafter, the "Petition"), whereby [Mother] requests this Court terminate the parental rights of [Father] to [J.B.].
>
> By way of background, the Court will provide a summation of the relevant procedural and factual background of these proceedings prior to reaching the merits of the Petition. Mother currently lives with her son [and daughter, J.B.].  Mother is forty-three years old and employed as a mental health specialist for Lawrence County Mental Health and Developmental Services.

Mother met Father in 2004, and they dated for six years. During the course of their relationship, J.B. was born. Following J.B.'s birth, Mother and Father were both actively involved in caring for J.B. and ensuring that her daily needs were met. J.B. was almost two years old when Mother ended her relationship with Father and obtained a Protection from Abuse Order against Father dated April 5, 2010. The April 5, 2010 Order included a custody provision which provided Mother with primary custody of J.B., but permitted Father to have visitation as agreed between the parties.[1] Father subsequently initiated a custody action against Mother, and following a Custody Conference, Father enjoyed partial custody rights every other weekend, provided that he let Mother inspect his residence and ensure that it could appropriately accommodate the minor child.[2]

[1] The April 5, 2010 Protection from Abuse Order permitted Father to have contact with Mother via telephone to make arrangements for custody visits.

[2] Prior to the entry of the April 5, 2010 Protection from Abuse Order, the parties resided together at the Mother's residence in Bessemer, Pennsylvania.

Father enjoyed visits with the minor child on May 8, 2010 and on May 22 through May 23, 2010. This overnight visit on May 22, 2010, was Father's last visit with J.B. because Mother learned that the address provided by Father was not his actual residence and that Father did not have a permanent address. Mother then petitioned for Father's visits to be supervised at Kids in Common. This Court temporarily granted Mother's request, pending a hearing. Prior to the hearing taking place, however, Father was found in contempt of court for violating the existing Protection from Abuse Order entered against him by Mother. Father was sentenced to a period of incarceration, with his sentence being suspended, and Father's periods of partial custody were required to be supervised at Kids in Common.

A second contempt of court was filed by Mother alleging that Father again violated the existing Protection from Abuse Order; the Court subsequently found Father to be in contempt, resentenced Father on the original contempt and extended Father's sentence for the second violation. Father was incarcerated from July 16, 2010 through February 11, 2011. Three days after Father was released, Father called Mother's cell

phone to try to speak with the minor child and arrange for a visit. Father was initially charged with harassment, but the charge was converted to a Protection from Abuse Violation. Father was found in contempt a third time, and he was sentenced to a term of incarceration of six months.

When Father was released on August 28, 2011, he did not have contact with the minor child. Father reasoned that he was fearful of being in contempt of court if he made any further efforts to contact the minor child. Father stated that he did try e-mailing the minor child's maternal grandmother [("Maternal Grandmother")], but his e-mails were not returned. Father also attempted to e-mail Mother's counsel, who requested that Father undergo a psychological evaluation. The majority of Father's subsequent e-mails did not prompt a response by Mother's counsel. In 2011, Mother petitioned the Court to change the minor child's last name by removing Father's surname from the child's hyphenated last name. Following a hearing, this Court denied Mother's request because the Court believed that Father intended to resume his relationship with the minor child. However, Mother testified that Father has not seen the minor child, sent cards or gifts to the minor child, paid support for the minor child or initiated supervised contact with Kids in Common since May, 2010. Mother opines that there is not a present bond between Father and the minor child because the last contact occurred when the child was two years old.

When asked about her effort to comply with the June 4, 2010 Order regarding Father's visitation at Kids in Common, Mother stated that she called on two occasions to initiate her intake evaluation. The first time, Mother was advised to wait because Father was incarcerated. The second time Mother called, she scheduled an appointment and subsequently completed her intake and paid her costs. Father did not complete an intake evaluation or pay for the costs of services.

The case remained stagna[nt] until June 11, 2013, when Father filed a Petition for Contempt and Modification. Following a hearing on August 30, 2013, Father's Petition was dismissed, and Mother subsequently requested modification of Father's custody rights. Mother failed to appear at the scheduled conference, however, and Mother's Petition for Modification was dismissed. Father then filed a Petition for Modification of Custody on October 23, 2013, and thereafter, an Order was entered

providing Father with supervised visits and reunification counseling.

Mother then filed a Petition for Termination of Natural Father's Parental Rights on December 13, 2013. Father presented the Court with a Motion to Dismiss Petition for Involuntary Termination of Parental Rights, which was granted, and Mother's petition was dismissed without prejudice. On February 10, 2014, Mother filed an Amended Petition for Involuntary Termination of Parental Rights which was also dismissed without prejudice upon motion by Father. On May 8, 2014, Mother filed a Second Amended Petition for Involuntary Termination of Parental Rights, which is presently before the Court for a determination. . . .

* * *

The facts of this case clearly establish that Father faced very significant obstacles to exercising custody of the minor child. Father was incarcerated from July 16, 2010 through August 28, 2011. When Father was released, Father stated that he did not try to contact J.B. because he feared doing so would result in another violation of the active Protection From Abuse Order entered against him by Mother. Father reasoned that he did not know what to do to initiate contact with J.B. and that if he did he would be incarcerated. Father stated that he did try emailing [M]aternal [G]randmother and [M]other's counsel, but these attempts were futile.

Father additionally testified to the fact that he made contact with J.B.'s school to obtain progress reports and weekly updates regarding the minor child's education. . . .

Orphans' Court Opinion, 7/17/15, at 1-10.

On July 17, 2015, the orphans' court granted Mother's petition and terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (2). Orphans' Court Opinion, 7/17/15, at 13. On August 13, 2015, Father filed a timely appeal and concise statement of errors complained of on

appeal pursuant to Pa.R.A.P. 1925(a)(2). The orphans' court filed a supplemental opinion on September 14, 2015.

On appeal, Father presents nine issues for this Court's consideration:

ISSUE I: WHETHER THE TRIAL COURT ERRED IN FINDING THAT THE FATHER'S ACTION CLEARLY EVIDENCED A REFUSAL AND FAILURE TO PERFORM PARENTAL DUTIES.

ISSUE II: WHETHER THE TRIAL COURT ERRED IN FINDING THAT THE PETITIONER/MOTHER HAS MET HER BURDEN OF ESTABLISHING BY CLEAR AND CONVINCING EVIDENCE THE GROUNDS FOR INVOLUNTARY TERMINATION OF PARENTAL RIGHTS PURSUANT TO 23 Pa. C.S.A. §2511(a)(1).

ISSUE III: WHETHER THE TRIAL COURT ERRED IN FINDING THAT THE PETITIONER/MOTHER HAS MET HER BURDEN OF ESTABLISHING BY CLEAR AND CONVINCING EVIDENCE THE GROUNDS FOR INVOLUNTARY TERMINATION OF PARENTAL RIGHTS PURSUANT TO 23 Pa. C.S.A. §2511(a)(2).

ISSUE IV: WHETHER THE TRIAL COURT ERRED IN FINDING THAT THE OBSTACLES PRESENTED TO THE FATHER DID NOT DEFINITIVELY PRECLUDE HIM FROM MAINTAINING A RELATIONSHIP WITH HIS DAUGHTER.

ISSUE V: WHETHER OR NOT THE TRIAL COURT ERRED IN FAILING TO FIND THAT THE FATHER UTILIZED ALL RESOURCES AVAILABLE TO ATTEMPT TO PRESERVE THE PARENT-CHILD RELATIONSHIP WITH HIS DAUGHTER.

ISSUE VI: WHETHER THE TRIAL COURT ERRED IN FINDING THAT THE FATHER'S EXPLANATION OF NOT PROVIDING CARDS, GIFTS, OR MONETARY SUPPORT OR THAT HE DID NOT CONTACT THE CHILD FOR FEAR OF VIOLATING THE PROTECTION FROM ABUSE ORDER WAS INSUFFICIENT.

ISSUE VII: WHETHER THE TRIAL COURT ERRED IN FINDING THAT THE FATHER AT ALL TIMES HAD THE ABILITY TO INITIATE CONTACT WITH J.B. THROUGH KIDS AT [sic] COMMON.

ISSUE VIII: WHETHER THE TRIAL COURT ERRED IN FINDING THAT THE TERMINATION OF PARENTAL RIGHTS WOULD BEST SERVE THE NEEDS AND WELFARE OF THE MINOR CHILD.

ISSUE IX: WHETHER THE TRIAL COURT ERRED IN FAILING TO TAKE INTO CONSIDERATION AS PART OF ITS DECISION IN THIS MATTER THE POSITION AND OPINION OF THE GUARDIAN AD LITEM APPOINTED BY THE COURT FOR THE MINOR.

Father's Brief at 6-7.

In reviewing an appeal from an order terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id*.; *R.I.S.*, 36 A.3d [567, 572 (Pa. 2011)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id*.; *see also Samuel-Bassett v. Kia Motors America, Inc.*, [613] Pa. [371], 34 A.3d 1, 51 (2011); *Christianson v. Ely*, 575 Pa. 647, 654, 838 A.2d 630, 634 (2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id*.

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In re: R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). Moreover, we have explained that "[t]he standard of clear and convincing

evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" *Id*. (quoting *In re J.L.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The termination of parental rights involves a bifurcated analysis, governed by Section 2511 of the Adoption Act.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the matter *sub judice*, the orphans' court terminated Father's parental rights under sections 2511(a)(1), (2), and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

  **(a) General rule**.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

      (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

      (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without

essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations**.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), and (b).

This Court may affirm the orphans' court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). **In re M.T.**, 101 A.3d 1163, 1179 (Pa. Super. 2014) (*en banc*). Because we agree with the orphans' court decision to terminate Father's parental rights pursuant to section 2511(a)(2), we need not address the other subsections of section 2511(a). **See In re N.A.M.**, 33 A.3d 95, 100 (Pa. Super. 2011) (observing that if we agree with the trial court's decision as to termination of parental rights under any subsection of 23 Pa.C.S. § 2511(a), we need not address the remaining subsections).

In his first issue, Father argues that the orphans' court erred in finding that Father's actions clearly evidenced a refusal and failure to perform parental duties. We disagree.

- 8 -

As noted above, from May 22, 2010, through December 13, 2013, the date that the underlying termination petition was filed, Father had no contact with J.B. Thus, the last time Father saw J.B. was when she was two years old; she is now eight years old. Additionally, Father repeatedly violated the PFA that Mother secured against him, he did not have a permanent address, and he failed to avail himself of the visitation opportunities provided through Kids in Common.

When Father contacted Kids in Common in 2010, he was informed that both Mother and he would need to complete an intake assessment. N.T., 5/7/15, at 37. Father argues that pursuing visitation through Kids in Common would have been futile because he would not have been eligible for visitation until Mother perfected her intake assessment, and she did not complete it until December 9, 2013. Father's Brief at 25. However, after his initial contact with Kids in Common in 2010, Father did not complete his intake assessment or endeavor to compel Mother to complete her assessment through the orphans' court. Father chose not to act. He then waited nearly three years to again contact Kids in Common. N.T., 5/7/15, at 39.

Mother's failure to expeditiously complete the assessment in no way excuses Father's absence from J.B.'s life or justifies Father's failure to pursue visitation. We are cognizant that Father was incarcerated on separate occasions at the times in question due to the aforementioned

violations of the PFA, but his efforts, both while incarcerated and while at liberty, were minimal. Thus, there was no abuse of discretion in the orphans' court's finding that Father's actions clearly evidenced a refusal and failure to perform parental duties.

With respect to Father's second issue, which is a challenge to the orphans' court's conclusions under 23 Pa.C.S. § 2511(a)(1), we need not address it. As we will discuss below, we are satisfied that Father's parental rights were properly terminated under 23 Pa.C.S. § 2511(a)(2). *In re N.A.M.* Therefore, we shall proceed to address Appellant's third issue wherein he alleges the orphans' court erred in finding that termination was appropriate under section 2511(a)(2).

Parental rights may be terminated under section 2511(a)(2) if the following conditions are met: "(1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (citation omitted). "[S]ection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect." *Id*.

Father again argues that the orphans' court erred in relying on the fact that he did not seek visitation through Kids in Common because he would not have been eligible due to Mother's failure to complete her intake assessment. Father's Brief at 26. Father ignores that we are reviewing **his** actions and **his** conduct. *In re L.M.*, 923 A.2d at 511. As discussed above, while it is true Mother did not complete her Kids in Common assessment in 2010 when she and Father first contacted the agency, Father chose not to compel Mother to remedy the situation. For nearly three years, Father exerted no effort in pursuing visitation with J.B. through Kids in Common.

After discussing Father's limited attempts at contact with J.B. and the obstacles he faced, the orphans' court found that:

> The Court, however, cannot reasonably characterize these actions as an attempt to establish contact or maintain a relationship with the minor child. The Court believes that Father's actions constitute a passive interest in the child's welfare, but they do not create any level of parental bond which could contribute to the minor child's overall well-being.
>
> As previously stated, the record establishes that Father experienced significant obstacles which substantively interfered with his ability to maintain a parental bond with the minor child. However, [throughout] the course of these proceedings, Father, at all times, had the ability to initiate contact with J.B. through Kids in Common and the Courts. The prevailing Custody Order consistently provided Father with supervised visits at Kids in Common, and on the few occasions that Father did contact Kids in Common, his own communication with the counselor was belligerent and counterproductive. . . .
>
> After analyzing the testimony presented, the Court is not satisfied that the obstacles presented to Father definitely precluded him [from] maintaining a relationship with his daughter. Father completely failed to provide the minor child

with any form of support that would have established his presence in the minor child's life. Specifically, since May of 2010, Father has not provided J.B. with any cards, gifts or monetary support. Father's assertion that he did not contact the child for fear of violating the existing Protection from Abuse Order is incredible given the undeniable fact that the minor child was not a protected person under the Order and that the Protection from Abuse Order provided Father with a suitable alternative to maintaining contact. Therefore, the Court finds that Father's actions clearly evidence a refusal and failure to perform parental duties.

Orphans' Court Opinion, 7/17/15, at 10-11.

After review, we conclude the orphans' court's decision was amply supported by clear and convincing evidence. Father's continued failure and refusal to be a parent to J.B. has remained unabated for the majority of J.B.'s life, and Father's excuses are unavailing. Therefore, we discern no error of law or abuse of discretion in the termination of Father's parental rights under 23 Pa.C.S. § 2511(a)(2).

In Father's fourth and fifth issues, he asserts that the orphans' court erred in finding that the obstacles he faced did not preclude him from maintaining a relationship with J.B. and that the court erred in finding that Father failed to utilize all resources available to preserve the parent-child relationship. Father's Brief at 27-31. For the reasons discussed in our analysis of Father's third issue, we conclude his claims of error are meritless. The orphans' court's conclusion that the obstacles Father faced were not a complete impediment and that Appellant failed to avail himself of all

available resources to maintain a bond with J.B. is supported by the record. Thus, he is entitled to no relief on these issues.

In his sixth issue, Father avers that the orphans' court erred in rejecting Father's contention that he did not provide cards, gifts, monetary support, or contact J.B. because he feared violating the PFA. We disagree.

The orphans' court found that since May of 2010, Father completely failed to contact J.B. or provide J.B. with any cards, gifts, or monetary support.[1] Orphans' Court Opinion, 7/17/15, at 11. The orphans' court concluded Father's claim that he did not contact J.B. for fear of violating the PFA was not believable. *Id*. "[T]he undeniable fact [is] that the minor child was not a protected person under the Order and that the Protection from Abuse Order provided Father with a suitable alternative to maintaining contact." *Id*. We agree with the orphans' court and find that Father's justification for his absence from J.B.'s life is untenable.

In his seventh issue on appeal, Father avers that the orphans' court erred in finding that he had the ability to initiate contact with J.B. through Kids in Common. Father's argument is merely a restatement of his claim we disposed of above, *i.e.*, pursuing visitation through Kids in Common would

_____

[1] We observe that sending cards or gifts to a child should not be the touchstone for maintaining a bond with a child. Other factors, including the child's age should be considered in such a situation. An infant, who is unable to grasp the concept of a greeting card or gift, is unlikely to be affected positively or negatively by the absence or presence of cards or gifts.

have been futile because Mother did not perfect her intake assessment until 2013. As we concluded previously, this claim is without merit, and we need not address it further.

In his eighth issue, Father asserts that the orphans' court erred in finding that the termination of his parental rights would best serve J.B.'s needs and welfare. Father points out that "[a] petition to terminate a natural parent's rights filed by one natural parent against the other . . . is cognizable only if an adoption of the child is foreseeable." Father's Brief at 35 (citing *In Re: Adoption of L.J.B.*, 18 A.3d 1098 (Pa. 2011)).

Here, the proposed adoptive parent is Mother's stepfather ("Maternal Stepfather"). Father argues that Maternal Stepfather's role will be as a grandfather to J.B.; Maternal Stepfather will not adopt the role of a parent and create a "new parent-child relationship." *Id*. at 36 (citing *Adoption of L.J.B.*). Father suggests that Maternal Stepfather cannot satisfy the adoptive parent role because he will maintain his own family in a separate household and not become a part of Mother and J.B.'s immediate family; thus, there will not be a "new" parent-child relationship. *Id*. at 37. We are constrained to disagree.

Recently, an *en banc* panel of our Court decided *In re Adoption of M.R.D.*, 128 A.3d 1249, 1260 (Pa. Super. 2015), *appeal granted*, ___ A.3d ___, 19 MAL 2016, 2016 WL 1047869 (Pa. 2016) (filed March 16, 2016). *M.R.D.* addressed this discrete issue:

- 14 -

With respect to [f]ather's contention that the proposed adoption will not create a new family unit, we conclude "cohabitation" is not the *sine qua non* of the "new family unit."[2] ***See In re Adoption of J.M.,*** [991 A.2d 321, 325 (Pa. Super. 2010)]. Neither the Adoption Act nor relevant case law defines "new family unit" or "new parent-child relationship" for purposes of a proposed adoption in the present circumstances. Further, this Court has already rejected the inflexible notion that cohabitation is absolutely required for a proposed adoption. In other words, the fact that [m]other and [m]aternal [g]randfather live in separate residences, both of which are family-owned residences, does not by itself thwart the proposed adoption plan in this case. ***See id***. . . .

> [2] The language "intact family unit" derives from those cases involving stepparent adoption where the natural parent and the stepparent are divorcing, and the stepparent (adoptive nominee) has separated from the natural parent and no longer wants to adopt.

As the Orphans' court did, we also focus on the familial relationship [m]aternal [g]randfather established with [the c]hildren, instead of the superficial, indefinite externals and speculations [f]ather suggests, such as what if [m]other should marry, which are nothing more than mere conjecture. The primary purpose of the Adoption Act is served by securing [the c]hildren in the parent-child relationship as proposed with [m]aternal [g]randfather, the adoptive nominee. ***In re E.M.I.,*** [57 A.3d 1278 (Pa. Super. 2012)]. The record makes clear [m]aternal [g]randfather and [the c]hildren already enjoy a healthy, deep emotional bond. Maternal [g]randfather serves as a *de facto* father to [the c]hildren. Formal adoption in this case will preserve the stability [the c]hildren already know and still create a "new" parent-child relationship, because adoption will legalize their respective rights and obligations. This legal authorization is what establishes the "new" in the existing *de facto* parent-child relationship. Maternal [g]randfather testified he both understands and accepts the legal obligations he will have as a parent through the proposed adoption. Therefore, [the c]hildren will not become "state-created orphans," as [f]ather insinuates. Based upon the foregoing, we hold the Orphans' court correctly terminated [f]ather's parental rights to [the

c]hildren, under the facts and circumstances of this case; [m]aternal [g]randfather qualified as a "good cause" candidate to adopt [the c]hildren and his proposed adoption of [the c]hildren is both legally feasible and realistically foreseeable; thus, termination of [f]ather's parental rights best serves the developmental, physical, and emotional needs and welfare of [the c]hildren. Accordingly, we affirm.

**M.R.D.**, 128 A.3d at 1265-1266.

In light of **M.R.D.**, we conclude that Father's contrary argument in the instant case is unavailing. While Maternal Stepfather will maintain a separate household, he has a bond with J.B., and nothing on this record or in Father's argument diminishes Maternal Stepfather's role in J.B.'s life or his status as a candidate to adopt J.B. Maternal Stepfather's adoption of J.B. "will preserve the stability [J.B.] already know[s] and still create a 'new' parent-child relationship, because adoption will legalize their respective rights and obligations. This legal authorization is what establishes the "new" in the existing *de facto* parent-child relationship." **M.R.D.**, 128 A.3d at 1266. Accordingly, we conclude that Father is entitled to no relief on this issue.

In his ninth issue, Father asserts that the orphans' court erred in failing to consider that J.B.'s guardian *ad litem* opposed termination of Father's parental rights. Father's claim is belied by the record. The orphans' court stated:

The Memorandum and Recommendation of Guardian *ad Litem* filed in this matter ultimately recommends that the termination of parental rights not be granted. In making the recommendation, the Guardian *ad Litem* highlights "Although

- 16 -

there exists significant legal issues regarding possible termination of Father's parental rights, the role of the Guardian *ad litem* is merely to recommend what he believes is in the best interest of [J.B.]."

Preliminarily, the Court is unaware of any authority which indicates it is definitively bound by the recommendation of the Guardian *ad Litem*. More significantly, the Guardian *ad Litem*, himself, recognizes the legal difficulties Father would need to overcome in hopes of not having his parental rights terminated. Ultimately, the Court reviewed and considered the Guardian *ad Litem's* Memorandum and Recommendation prior to issuing the Opinion and Order.

Pa.R.A.P. 1925(a) Opinion, 9/14/15, at 12-13.

The orphans' court is required to make all credibility determinations and may believe all, part, or none of the evidence presented. **In re J.F.M.**, 71 A.3d 989, 992 (Pa. Super. 2013). In his brief on appeal, Father concedes that there is no authority that requires the orphans' court to follow the recommendation of the Guardian *ad Litem*. Father's Brief at 38. We conclude contrary to Father's assertion, that the orphans' court did consider the Guardian *ad Litem's* position. Moreover, the orphans' court considered all other relevant information, as evidenced by its opinions filed on July 17, 2015 and September 14, 2015. Thus, the orphans' court's decision is supported by the evidence of record. We are not permitted to reweigh the evidence or substitute our judgment for that of the orphans' court. **In re J.F.M.**, 71 A.3d at 996. Father's claim of error is without merit.

Finally, because we concluded that the orphans' court committed no error of law or abuse of discretion in terminating Father's parental rights

under 23 Pa.C.S. § 2511(a)(2), we must address the orphans' court's needs-and-welfare evaluation under 23 Pa.C.S. § 2511(b). To this end, our Supreme Court ruled:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." **In re K.M.**, 53 A.3d 781, 791 (Pa. Super. 2012). In **In re E.M.**, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. **In re K.M.**, 53 A.3d at 791.

**In re T.S.M.**, 71 A.3d 251, 267 (Pa. 2013). In conducting a bonding analysis, the orphans' court is not required to use expert testimony. **In re K.H.B.**, 107 A.3d 175, 180 (Pa. Super. 2014).

The orphans' court addressed section 2511(b) as follows:

> The needs and welfare of a minor child are "essential to considerations, but bifurcated from, and not relevant to the proof of the statutory requirements for termination of parental rights." As previously stated, the uncontroverted evidence establishes that Mother has been the sole caregiver for J.B. since her birth. Mother has a normal and healthy parent-child relationship with J.B. Father's last visit with J.B. occurred on May 22, 2010 when J.B. was two years old. Consequently, J.B. does not have a current relationship with Father, and Mother testified that J.B. would not recognize Father if they met in passing. All of J.B.'s emotional and familiar ties are to Mother and to Mother's family.

> Father argues that termination of his parental rights would not serve J.B.'s best interests because Mother is proposing that her step-father adopt J.B. Father believes that the relationship

- 18 -

J.B. currently enjoys with her maternal grandfather would not change, and although it is a strong relationship, there is no benefit if maternal grandfather adopts J.B. In considering Father's argument, the Court believes that Mother's proposed adoption does in fact serve J.B.'s best interests because it would [preserve] the stability and continuity J.B. presently enjoys while fulfilling the legal void created by termination of Father's parental rights. Based upon these findings, the Court concludes that terminating Father's parental rights will best serve the needs and welfare of the minor child.

Orphans' Court Opinion, 7/17/15, at 12-13 (internal citations omitted).

We find that the orphans' court amply considered the needs and welfare of J.B. along with any bond that may exist between Father and J.B. The orphans' court considered Mother's testimony regarding the absence of a bond between J.B. and Father because the child simply does not know him. As the trial court's factual findings are supported by the record, and the court's legal conclusions are not the result of an error of law or an abuse of discretion, we affirm the trial court's decision with regard to section (b). *Adoption of S.P.*, 47 A.3d at 826-827.

For the reasons set forth above, we conclude that Father is entitled to no relief. Accordingly, we affirm the order terminating Father's parental rights.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/19/2016